## BATTERY PARK NATIONAL BANK

*v.*

## FREDERICK BROWN et al.

### [Decided July 2d, 1915.]

1. In an action by the creditor of a bankrupt to set aside a conveyance as having been made to defraud the bankrupt's creditors, evidence *Held* sufficient to show fraud.

2. Where the owner of realty conveyed it to defraud his creditors, the grantee participating in the purpose, declarations and acts of such owner disparaging title, subsequent to the conveyance, but when he was in possession of the property and was holder of the record title, were admissible in evidence in a suit against the grantee to set aside the conveyance,· for the principle that a declaration of·a party after he had parted with his interest in the subject-matter of the litigation cannot be received to disparage the title or right of a party acquired in good faith previous to the time of making such declaration, is inapplicable in cases of fraudulent conveyances.

*Messrs. Condict, Condict & Boardman,* for the plaintiff.

*Mr. Carl· Lentz,* for the defendant.

LEWIS, V. C.

· The complainant files a bill to set aside a conveyance of the land and premises No. 519 Washington street, Newark, New Jersey, made by Frederick M. Hunt to Frederick Brown, dated on the 3d day of December, 1910.

It is alleged in the bill that the conveyance was fraudulent; that it was made for the purpose of defrauding the creditors of Frederick M. Hunt.

The purchase price of the property was $12,000, and Mr. Brown says he arranged for the purchase on the 21st day of November, 1910, by paying $2,500 on account. The balance of the purchase price was to be paid when the deed was delivered.

The testimony discloses that the transaction was completed

in the office of L. E. Hart, Esq., a member of the bar of this state. Mr. Hart says that on the 3d day of December, 1910, Frederick M. Hunt, Mr. Brown and a Mr. Harding appeared at his office in Westfield, New Jersey, and that Hunt asked him to take his acknowledgment to a deed. He did so, having first examined it, and that Mr. Brown, the purchaser, then handed him the sum of $9,500 in bills, which he counted, and then handed to Mr. Hunt. No attempt is made by the complainants to impeach the testimony of Mr. Hart, but they count on the fact that there is enough in the case to convince the court that the payment of the money in Hart's office was a bare pretence.

The deed was not recorded until the 27th day of April, 1912. On September 13th, 1912, Frederick M. Hunt filed a voluntary petition in bankruptcy in the United States District Court for the southern district of New York, and was on the same day adjudged a bankrupt. George F. Trask was appointed trustee of the bankrupt's estate, and was subsequently, upon petition, made a party in this case. He filed a. cross-petition against Frederick Brown, claiming the property in question as part of the bankrupt's estate. Brown has answered this cross-bill.

The evidence before the court deals with a rather singular transaction. Frederick Brown, the purchaser, is shown to be a man having no very great resources and employed most of his life at a moderate salary. He says he purchased the property for investment.

The source of his money with which he did this does not clearly appear. The solicitor for the defendants contends that he had sufficient financial ability to make it. Bank books were in evidence showing that he had some $5,000 to his credit in the Security Savings Bank of Newark, New Jersey, $3,200 of which he drew out in March and April of 1910. A bank book of the Howard Savings Institution was also offered in evidence, showing a balance of $3,500 to Mr. Brown's credit, from which he drew $2,400 in March, 1910. The sums which were drawn from these two banks, he says, he placed in a box and used to purchase the Hunt property. The necessity of transferring the money from the banks to the box is not shown by the evidence, and, of course, these two sums that were withdrawn are not

sufficient to make up the purchase price. Mr. Brown, however, says they were mingled with other moneys given him and which he had saved and placed in the box. He says he saved the larger part of his salary, among other things. The testimony does not indicate that any of the money paid by Mr. Brown to Frederick M. Hunt found its way into the latter's bank account.

Mr. Brown says, that after the final payment had been made of the purchase price that he did not visit the property until the latter part of the month. Then, he says, he offered it to Mrs. Jacques, a sister of Frederick M. Hunt, at a rental of $50 per month, she to pay the water rates. Mrs. Jacques was examined in the Frederick M. Hunt bankruptcy proceedings, and during the progress of her examination what was said to be twenty-three rent receipts from Mr. Brown to her were produced. Request was immediately made to have the receipts left with the trustee, but counsel for the bankrupt refused, on the ground that he had not Mrs. Jacques's consent. These receipts were not produced before me, although called for, and they seem to have disappeared.

Brown says that in 1906 he lent Frederick M. Hunt $8,500 in cash from money that he took from a secret place he had in his room at his home. Thirty-seven hundred dollars of this money came from an uncle. The money was loaned him on a promissory note, and when it came due Frederick M. Hunt failed to pay it, but Williams Hunt, a brother, discharged the obligation. No proof is offered to show where this money went.

Brown says that in November, 1910, Frederick M. Hunt again applied to him for a loan, but that he informed him that he did not feel like advancing it, but he would like to buy some property. He says that Frederick M. Hunt then asked him, "How about buying my house?" Hunt stated to him that he wanted $12,000 for it. Brown says he thought the price was all right and that is how he decided to purchase it. He says that the purchase price was all paid in cash, *i. e.,* the $12,000. Of this, about $11,000 was taken out of the box in which his grandmother had kept her money, and was part of her estate. This box was kept in a secret closet in the house where he lived. It was not in the same room that the $8,500 to make the loan to

Frederick M. Hunt was kept. One thousand dollars, however, was taken from his own box. Brown, in the bankruptcy proceedings, testified that he had taken the money for the house and the money for the loan out of the same box. He says that the $2,500 of the purchase price was paid at the stable of Hunt Brothers, in Newark, in cash—large bills—and Brown says he took a receipt, which he turned over to his former lawyers. It was not produced at the hearing before me.

In the bankruptcy proceeding Brown said that the payment was made in the presence of Dr. Ortman. In this court he testified that Dr. Ortman was not present, and in the former proceeding Frederick M. Hunt says that Dr. Ortman was present, while in this case all agree that he was not there.

Frederick M. Hunt further testified that Dr. Ortman was present at Westfield when the final payment was made, and that they went there in Dr. Ortman's automobile. Dr. Ortman says he was not present on either occasion. A pencil memorandum was exhibited to him at the trial, and he identified it as having been given by Frederick M. Hunt in December, 1912, with a request that he memorize it and be prepared to testify to the allegations stated by it. The memorandum was as follows:

"Fred M. Hunt to Fred Brown, $2500. Nov. 21st, 1910, a/c house 519 Washington Street. Balance to be paid time deed made out. Amount to $9500, total $12,000."

This memorandum was subsequently given to William L. Blanchard, a witness in this case, and found its way to the hands of one of the solicitors of complainant, Mr. Richard Boardman. Frederick M. Hunt, a short time after Dr. Ortman had presented William L. Blanchard with this memorandum, testified to the very facts he had urged Ortman to memorize so that he might be able to relate them.

Mrs. Ortman was a witness before me and identified a draft of an affidavit in the Frederick M. Hunt bankruptcy case, in which her husband was named as an affiant; the tale of the payment of $2,500 at the stable in the presence of her husband; the trip to Westfield in his automobile and the payment of $9,500 and the delivery of the deed are all set forth in the affidavit.

This paper, Mrs. Ortman says, Frederick M. Hunt persistently urged her to persuade her husband to sign. The story of Dr. Ortman's part in these proceedings is apparently a mere invention.

William L. Blanchard, a contractor of the city of Newark, who, at the time, was building a garage for Frederick M. Hunt, testified that on April 27th, 1912, Hunt came to him at the garage and, taking him aside, gave him two assignments of mortgages and one deed, which was the deed in question, for the premises 519 Washington street, Newark; that Hunt told him that he had borrowed quite a sum of money from the banks in New York, and that

"He was afraid they were going to put the screws to him, and he had to get somebody to date the instruments back, and he wanted to know if I would not get them right on record."

Blanchard says he took the three papers to his lawyer's office and that he filled his own name in as assignee of one of the mortgages; that he gave the deed to 519 Washington street in question and one of the assignments to his lawyer to have recorded in the Essex county register's office. His lawyer, who recorded these papers, corroborates him. The deed itself also corroborates his statement, the time of recording being eleven-twenty-five A. M., on April 27th, 1912.

In the bankruptcy proceedings, Frederick Brown says he gave the deed to Lum, Tamblyn & Colyer to record. He could not recall, however, what year, or when he had done so. He said that it might have been in the year 1911, but he was not certain. Between April 1st, 1912, and April 9th, 1912, the complainant in this case lent Frederick M. Hunt $10,800 on several demand notes, and to many of his creditors Frederick M. Hunt gave notes on or about April 27th, 1912, the date the deed was recorded.

Frederick M. Hunt lives in the property with his sister, he says, as a boarder, and pays her $5 a week. He occupied the premises prior to the transfer of the property to Mr. Brown.

Mr. Brown says, upon return from Mr. Hart's office, that he put the deed in a box in his room. The deed remained there for

sixteen months. His explanation for not recording it was, that he was a sick man at the time of the purchase, and that part of the sixteen months he was out of the state traveling for his health. He tells a different story before me as to the recording of the deed from that which he related in the bankruptcy proceedings. He says that a few days before April 27th, 1912, he was in the stable of Mr. Williams A. Hunt, which he frequented often, and that he handed the deed to Williams A. Hunt to have it recorded.

Evidence that the property was assessed for taxes to Frederick M. Hunt, in 1911, was introduced, and that the taxes were paid that year by the check of Hunt Brothers. Mr. Brown says that he was about to go away, and he handed the money for the taxes to Williams Hunt and requested him to pay the same, which Williams Hunt did, by the check just before mentioned.

If you take out of the case the happenings in the office of Mr. Hart, there is nothing before the court that could possibly lead it to conclude that there had been a *bona fide* transaction between Frederick M. Hunt and Frederick Brown. The stories of the defendant and his witnesses are full of contradiction and bear the stamp of being highly improbable. Brown says he bought the property for investment, but the facts are these: He never had the title searched; he never had the property insured; the return is very small on the investment, smaller, according to the calculations made, than the money would have earned if left on deposit in a trust or savings bank in this state, and Frederick M. Hunt, the former owner and occupant, is still living in the house, he says, as a boarder, with his sister, Mrs. Jacques, the tenant of Mr. Brown.

The defendants' counsel contends that the declarations and acts of Frederick M. Hunt are not properly admissible in this case, as they were subsequent to the purchase by Mr. Brown. The evidence does not sustain this contention. The representations to the bank were made at the time when Hunt was not only in possession of the property, but was the holder of the record title. The admissions of fraud to Blanchard were made when Frederick M. Hunt held the record title and he handed to Blanchard the Brown deed.

The general rule undoubtedly is, that a declaration of a party after he has parted with his interest in the subject-matter of the litigation cannot be received to disparage the title or right of a party acquired in good faith previous to the time of making such declaration, but, as is stated in *Carnahan* v. *Wood* (*Tenn.*), *2 Swan 500, 502*, "this very just and reasonable principle must be taken as inapplicable in cases of fraudulent sales of property."

In *Outcalt* v. *Ludlow, 32 N. J. Law 239*, it is held that the acts and declarations of a party while in possession are competent evidence for or against those who claim under him to show the character of his possession during the period covered by them in their claim of title.

I think from the evidence in this case that Frederick Brown participated in a fraud, and, therefore, it takes it out of the line of cases suggested by counsel for the defendants, as dispositive herein, *i. e., Merchants National Bank* v. *Northrup, 22 N. J. Eq. 58; New York Fire Insurance Co.* v. *Tooker, 35 N. J. Eq. 408; Muirheid* v. *Smith, 35 N. J. Eq. 303.*

His conduct and acts regarding the transaction are most extraordinary and unusual. It seems clear that the court must conclude that the property on Washington street, Newark, is part of the estate of Frederick M. Hunt, and that the deed to Brown should be set aside as fraudulent.

A decree will be accordingly advised.